1 **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Superior Marble, L.L.C., | No. CV 10-00616-PHX-SMM |
| Plaintiff, | **ORDER** |
| vs. | |
| Omya, Inc., | |
| Defendant. | |

Before the Court is Plaintiff Superior Marble, L.L.C.'s ("Superior") Motion For Partial Summary Judgment. (Doc. 37). Defendant Omya, Inc. ("Omya") responded (Doc. 46) and Superior replied (Doc. 49). After consideration of the issues, the Court finds the following.[1]

**BACKGROUND**

Until 2010, Superior produced and sold sand, feed supplements, gravel, and specialty products made from marble found in only a few locations in North America, including the Queen Creek Quarry (the "Quarry") owned and operated by Omya. (Doc. 1 at 2; Doc. 47 at 1-2). On November 12, 1999, Superior and Omya entered into a long-term "Arizona Supply

---

[1] The parties requested oral argument in connection with this Motion for Partial Summary Judgment. (Docs. 37, 46). The parties have had the opportunity to submit briefing. Accordingly, the Court finds the pending Motion suitable for decision without oral argument and the parties' request is denied. See LRCiv 7.2(f).

Agreement" (the "Agreement"), which provided that Omya would supply Superior with marble from the Quarry for at least twenty years. (Doc. 1 at 2; Doc. 47 at 2; Doc. 47-4 at 5).

The Quarry is located on U.S. Forest Service land in Pinal County, Arizona. (Doc. 1 at 3; Doc. 47 at 2). Pursuant to federal regulations, Omya needed approval from the U.S. Forest Service (the "Forest Service") to operate and mine the Quarry. (Doc. 46 at 6; Doc. 47-5 at 2). In 1997, Omya purchased the Quarry and asserts that it initially operated the Quarry under existing temporary permits. (Doc. 47-5 at 2). By 1999, Omya had discussed with the Forest Service a plan to expand the Quarry's operations. (Doc. 47-5 at 2). On November 1, 2002, the Forest Service issued a Decision Notice and Finding of No Significant Impact (the "Decision") pertaining to Omya's planned Quarry expansion. (Doc. 47 at 9). The Decision allowed Omya to continue mining and processing marble and to expand operations to an additional 123 acres of Forest Service land. (Doc. 47-7 at 2).

The Decision also required Omya to comply with certain conditions, including that Omya pave an access road to the Quarry. (Doc. 47-7 at 2). In November 2003, Omya submitted and the Forest Service approved a revised Plan of Operation (the "Plan"). (Doc. 14 at 2; Doc. 47-1 at 6). In 2008, work commenced on the access road with an estimated cost of $885,000. (Doc. 47 at 10). Omya avers that by about October 2008, it became apparent that implementing the Plan would cost about $2.5 million. (Doc. 47 at 11; Doc. 47-5 at 5). On February 6, 2009, citing the unexpected cost of implementing the Plan, Omya gave notice to Superior that it was halting operations at the Quarry. (Doc. 47 at 7). Omya continued to supply materials to Superior until about September 22, 2009, when Omya gave notice to Superior that no further deliveries would be made. (Doc. 47 at 7).

On March 19, 2010, Superior filed its Complaint alleging Breach of Contract and Breach of Duty of Good Faith and Fair Dealing. (Doc. 1). Omya's Answer raised the affirmative defense that Paragraph 3(b) of the Agreement ("Paragraph 3(b)") precludes Omya from liability for suspension of operations because Omya was obligated to incur significant

liability and expense in order to obtain and maintain a permit to operate the Quarry. (Doc. 14 at 6, 8). Paragraph 3(b) of the Agreement reads as follows:

> [Omya] shall use diligent effort to obtain all necessary permits, licenses and/or approvals to enable [Omya] to extract stone and/or operate the Quarry as presently conducted from all appropriate federal, state, and local governmental agencies (the "Permits"). If at any time during the Initial Term or Renewal Term (i) any Permit assigned or transferred to [Omya] shall be terminated or suspended by a court or governmental agency or (ii) [Omya] is unable to obtain any of the Permits for any reason whatsoever, this agreement, and all obligations of [Omya] to supply stone to [Superior] shall cease until such time as any such Permit shall be reinstated or granted, as the case may be. The suspension of any of [Omya]'s obligations pursuant to the provision of this clause (b) shall not extend the term of this Agreement. Nothing herein shall require [Omya] to take any adverse action or to incur any significant liability or expense in order to obtain any of the Permits. [Omya] agrees to inform [Superior] at the time in which [Omya]'s knowledge of a potential problem or impediment to permitting exists, of any problem or impediment to obtaining or renewing an applicable Permit for [Superior]'s successful operation. The successful operation applies to [Omya]'s ability to make available to [Superior] the Maximum Order specified herein.

(Doc. 38-4 at 5-6). On April 29, 2011, Superior filed a Motion for Partial Summary Judgment seeking a ruling that, as to Superior's Breach of Contract Claim (Count 1), Paragraph 3(b) does not excuse Omya's alleged failure to perform its duties under the Agreement. (Doc. 37). Omya responded that the permitting process was ongoing and that Paragraph 3(b) does not limit when Omya must make a determination regarding whether an expense required for "obtain[ing]" a Permit is "significant." (Doc. 46 at 9, 12).

## LEGAL STANDARDS

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also

Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the nonmovant must set out specific facts showing a genuine dispute for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

**DISCUSSION**

The interpretation of the language of a contract is a question of law for the court. Hadley v. Sw. Props., 570 P.2d 190, 193 (Ariz. 1977). Where the plain language of an agreement is unambiguous, it must be given effect as written. Id.; see Mining Inv. Group, LLC v. Roberts, 177 P.3d 1207, 1211 (Ariz. Ct. App. 2008). If the court finds that the contract language is "reasonably susceptible" to the interpretation asserted by its proponent, extrinsic evidence may be admitted to determine the parties' intent. Taylor v. State Farm Mut. Auto Ins. Co., 854 P.2d 1134, 1140 (Ariz. 1993). However, parol evidence is inadmissible to "vary or contradict the meaning of the written words" of the contract. Id.

In its Motion for Partial Summary Judgment, Superior contends Omya cannot invoke Paragraph 3(b) to cease performance of their contractual obligations under the Agreement.

- 4 -

(Doc. 37 at 5). Paragraph 3(b) defines "Permits" as "all necessary permits, licenses and/or approvals required to enable [Omya] to extract stone and/or operate the Quarry" at the time the parties entered into the Agreement. (Doc. 38-4 at 4). Superior asserts that Paragraph 3(b) is inapplicable because Omya had obtained a Permit. (Doc. 37 at 5). Omya responds that the permitting process was ongoing and that there is nothing in the language of Paragraph 3(b) that states when Omya is obligated to determine whether an expense required for "obtain[ing]" a Permit is "significant. (Doc. 46 at 12). Omya further contends that the Court should consider extrinsic evidence related to Omya's intent at the time that it entered into the Agreement. (Doc. 46 at 16). Omya also asserts that the amount it would have needed to spend on implementing the Plan was "significant" for the purposes of Paragraph 3(b). (Doc. 46 at 7-9).

The Court finds that Paragraph 3(b) does not allow Omya to cease performance of its contractual obligations to Superior when Omya possessed "all necessary permits, licenses, and/or approvals required to enable Omya to extract stone and/or operate the Quarry as . . . conducted" at the time the parties entered into the Agreement. (Doc. 38-4 at 4). The language is clear: "Nothing herein shall require [Omya] to take any adverse action or to incur any significant liability or expense in order to obtain any of the Permits." (Doc. 37 at 5). The contract language says nothing about "maintaining" a Permit as Omya's third affirmative defense asserts. (Doc. 14 at 6). Omya submits that the proper definition of "obtain" is "to gain or attain usually by planned action or effort." (Doc. 46 at 10 (citing State v. Darby, 123 Ariz. 368, 373 (1979))). This definition does not support Omya's argument here, where there is no evidence that Omya had ever failed to "gain" or "attain" a Permit.

The Decision states that Omya was "allow[ed] . . . to continue mining and processing limestone material, affecting an additional 123 acres of National Forest System lands." (Doc. 47-7 at 2). In short, Omya had obtained a Permit. Omya could continue operating the Quarry as it did when the parties reached the agreement.(Doc. 47-7 at 2). Omya avers that it was able to continue operating the Quarry and supplying Superior with marble when it halted

- 5 -

1 | operations and delivery. (Doc. 47 at 7-8 ). Anthony Colak, Omya's Chief Executive Officer since 2003, acknowledged that Omya had the Forest Service's permission to operate the Quarry at the time operations were suspended. (Doc. 38-12 at 3).

Further, the Court will not admit the extrinsic evidence Omya offers in support of it position. Omya presents the declaration of its former President, James Reddy, as extrinsic evidence that the "purpose of [Paragraph 3(b)] was to give Omya the right to abandon the approval process if the cost to Omya were 'significant' . . . in that event, Omya would not be obligated to sell stone to Superior." (Doc. 46 at 16). In his declaration, Mr. Reddy discusses Omya's concern at the time it entered into the Agreement that the Forest Service might require Omya to expend significant sums of money in order to acquire a Permit. (Doc. 47-6 at 2). For this reason, according to Reddy, Omya understood the Agreement to give it an "out" if the expense of obtaining approval became significant. (Doc. 47-6 at 2). The Court finds that Paragraph 3(b) is not "reasonably susceptible" to Omya's interpretation. Taylor, 854 P.2d at 1139-1140. Parol evidence is never admissible to "vary or contradict the meaning of the written words" of the contract. Id. The admission of Mr. Reddy's statements would "vary or contradict the meaning of the written words" of the contract and would violate Arizona's parol evidence rule. Id.; (Doc. 47 at 6).

Also, Omya's contention that the amount that would have been spent on implementing the Plan was "significant" for the purposes of Paragraph 3(b) is irrelevant and unavailing. (Doc. 46 at 7). The issue is whether or not Paragraph 3(b) provides a legal defense for Omya's failure to perform its obligations to Superior so long as it possessed a Permit. Because Omya had obtained a Permit, whether the prospective expenditure was "significant" makes no difference for the purpose of this Motion for Partial Summary Judgment.

/ / /
/ / /
/ / /
/ / /

**CONCLUSION**

**IT IS HEREBY ORDERED GRANTING** Superior's Motion for Partial Summary Judgment (Doc. 37) only to the extent that Paragraph 3(b) is an invalid affirmative defense with respect to Superior's Breach of Contract Claim (Count 1).

DATED this 27th day of July, 2011.

_____
Stephen M. McNamee
United States District Judge